| | |
|---|---|
| HELEN L. COBBS )<br>       Plaintiff )<br>     )<br>v. )<br>     )<br>FIRST TRANSIT, INC. )<br>And )<br>CENTRAL VIRGINIA TRANSIT )<br>MANAGEMENT CO., INC. )<br>And )<br>GREATER LYNCHBURG TRANSIT CO. )<br>And )<br>DENNIS DORSEY )<br>And )<br>KEVIN LACY )<br>And )<br>ALAN ROBEY )<br>And )<br>GLORIA BERKLEY )<br>And )<br>KAREN WALTON )<br>       Defendants ) | Case No. 6:16-cv-00015-NKM |

## AMENDED COMPLAINT

### I. NATURE OF THE CASE

1. Plaintiff, Helen L. Cobbs, brings this action for damages based on the denial of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq., as amended by the Civil Rights Act of 1991 (hereafter "Title VII"), and the common law. Defendants, and/or its agents, caused damages to Ms. Cobbs when they subjected her to injuries under common law, and sexual harassment and retaliation in violation of Title VII.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4), and 42 U.S.C. §2000e-5.

3. Pursuant to 28 U.S.C. §1391(e) and 42 U.S.C. §2000e-5(f)(3), venue is proper in the Western District of Virginia, Lynchburg Division, because the claims asserted herein arose in Lynchburg, Virginia, which is also the location of the acts relevant to the claims asserted by Ms. Cobbs.

## III. PARTIES

4. Plaintiff, Helen L. Cobbs, (hereafter "Ms. Cobbs") is a resident of the Commonwealth of Virginia, and a citizen of the United States of America.

5. Defendant, Greater Lynchburg Transit Company (hereafter "GLTC") is incorporated and registered to do business in the Commonwealth of Virginia.

6. Defendant First Transit, Inc., (hereafter "First Transit") is incorporated in the state of Delaware and registered to do business in the Commonwealth of Virginia.

7. Defendant Central Virginia Transit Management Company, Inc., (hereafter "CVTMCI") is incorporated and registered to do business in the Commonwealth of Virginia.

8. At all times material to this action, defendant Dennis Dorsey (hereafter "Mr. Dorsey") was employed by First Transit or CVTMCI as an Assistant General Manager, acting within the scope of his duties and under color of state and local law.

9. At all times material to this action, defendant Kevin Lacy (hereafter "Mr. Lacy") was employed by First Transit or CVTMCI as a supervisor acting within the scope of his duties and under color of state and local law.

10. At all times material to this action, defendant Alan Robey (hereafter "Mr. Robey") was employed by First Transit or CVTMCI as Director of Transportation acting within the scope of his duties and under color of state and local law.

11. At all times material to this action, defendant Gloria Berkley (hereafter "Ms. Berkley") was employed by First Transit or CVTMCI as Human Relations Manager, acting within the scope of her duties and under color of state and local law.

12. At all times material to this action, defendant Karen Walton (hereafter "Ms. Walton") was employed by First Transit or CVTMCI as General Manager over operations acting within the scope of her duties and under color of state and local law.

## IV. STATEMENT OF FACTS

13. Ms. Cobbs was hired by CVTMCI and/or GLTC on or about November 28, 2011, as a bus operator.

14. On or about December 10, 2013, Ms. Cobbs was injured in a work related accident.

15. On or about December 11, 2013, Ms. Cobbs was restricted to light duty employment related to her work injury.

16. Ms. Cobbs was given a light duty position working under the supervision of defendant Dennis Dorsey.

17. On one occasion in December of 2013 Ms. Cobbs was assigned the task of pulling pay stubs from boxes in a storage room.

18. Mr. Dorsey would come into the storage room to check on Ms. Cobbs, and make comments to her about her being "pretty" and "cute."

19. In December of 2013 Mr. Dorsey gave Ms. Cobbs a Christmas card which stated that "one of the nicest things of all is a warm thought of someone special - someone like you." (See Exhibit 1).

20. On or about December 23, 2013, Mr. Dorsey sent Ms. Cobbs a text message which said that he was "still up, thinking of you." (See Exhibit 2).

21. On or about December 24, 2013, Mr. Dorsey sent Ms. Cobbs a text message which said "What would you like Santa to bring you for Christmas?" (See Exhibit 2).

22. In January of 2014 Ms. Cobbs was working in Mr. Dorsey's office on a daily basis.

23. In Mr. Dorsey's office Ms. Cobbs would work at the computer which sat on the left side of Mr. Dorsey's desk.

24. During this period Mr. Dorsey would make comments to Ms. Cobbs about her "looking pretty today", that her "hair is looking nice", and that she was "looking jazzy today."

25. On one occasion in January of 2014 Ms. Cobbs made a mistake on the computer and Mr. Dorsey leaned over to her, with his body rubbing against her breasts.

26. Ms. Cobbs told Mr. Dorsey that he was "putting her in a bad position" as she was secluded in his office with him and the door was closed.

27. During this period in January of 2014, Ms. Cobbs would often observe Mr. Dorsey, Allen Robey, and Kevin Lacy, joking around in Mr. Dorsey's office, and could tell they were buddies.

28. When Mr. Dorsey would leave the office to run errands he would require Ms. Cobbs to accompany him.

29. On one occasion Mr. Dorsey had Ms. Cobbs ride with him to Best Buy.

30. While on the expressway to Best Buy Mr. Dorsey placed his hand on Ms. Cobbs knee while smiling at her.

31. Ms. Cobbs told Mr. Dorsey to "keep his eyes on the road" and then explained that she was uncomfortable working in the office with him.

32. Mr. Dorsey later told Ms. Cobbs that she could "have it anyway she wanted", and threatened that he could "fix it where there wouldn't be any light duty work available for her" and she could just "stay home and get partial pay."

33. Ms. Cobbs pleaded with Mr. Dorsey to stop the unwanted advances on several occasions, and the advances would stop for a few days.

34. Mr. Dorsey would send text messages to Ms. Cobbs indicating that she could "have anything she wanted" such as a schedule that would accommodate her with no weekends.

35. Ms. Cobbs went to a supervisor, Barry Williams, to report the incidents but feared she would lose her job if Mr. Williams communicated her allegations to Mr. Lacy, and Mr. Lacy went back and communicated her allegations to Mr. Dorsey.

36. In February of 2014 Ms. Cobbs was still working directly under Mr. Dorsey.

37. Mr. Dorsey asked Ms. Cobbs several times whether she "had given any thought to what she's going to do" and that he would "give her more time to think about everything," related to Ms. Cobbs starting a sexual relationship with him.

38. After a few days of no response from Ms. Cobbs, Mr. Dorsey tells her that there is no more light duty work and that she had to take time off.

39. On or about February 20, 2014, Mr. Dorsey sent a text to Ms. Cobbs which said "Guess I'm not getting my text! Anytime you want to take a Flex…, and rest come on over!" (See Exhibit 2).

40. On or about February 20, 2014, Mr. Dorsey sent Ms. Cobbs a text message that she "should ride to MD" with him. (See Exhibit 3).

41. On or about the weekend of February 21, 2014, Mr. Dorsey was calling and texting Ms. Cobbs, asking if she wanted to join him in Maryland, to which she responded "no".

42. Ms. Cobbs returned back to work and was given the assignment of answering the phone.

43. On or about the evening of February 26, 2014, Mr. Dorsey sent a text to Ms. Cobbs stating that he was watching a movie and wished she was there with him. (See Exhibit 3).

44. Mr. Dorsey continued to text Ms. Cobbs throughout the week, asking whether she has had enough time to think about what she wanted to do.

45. During the months of February and March Mr. Dorsey required Ms. Cobbs to drive him to the airport and pick him up from the airport at times when she was not at work, not on the clock, and not being compensated.

46. At times when Mr. Dorsey would call Ms. Cobbs about the off hour rides, her daughter Salay Cobbs (Adams), who also worked at GLTC, would be home.

47. On more than one occasion Ms. Cobbs' daughter, Salay would receive a "missout" and Mr. Dorsey would "override" it, put a smiley face on it, and give it to Ms. Cobbs.

48. In March of 2014, Mr. Dorsey began inviting Ms. Cobbs out to eat and to his home. (See Exhibits 3 and 4).

49. On or about March 5, 2014, Mr. Dorsey sent Ms. Cobbs a text message asking whether she was "in uniform or did [she] wear something cute?"  (See Exhibit 3).

50. On or about March 7, 2014, Mr. Dorsey sent Ms. Cobbs a text message that stated "If you need to escape the dynamic duo tonight, I'm up late! :)"  (See Exhibit 4).

51. On or about March 8, 2014, Mr. Dorsey sent Ms. Cobbs a text message that said "Hello! Beautiful Day! We gonna get together sometime today?"  (See Exhibit 4).

52. On or about March 11, 2014, Mr. Dorsey sent Ms. Cobbs a text message that said "If you come and visit me it's nothing but peace and quiet at my place...u have an open invitation to visit any time!"  (See Exhibit 4).

53. On or about March 11, 2014, Mr. Dorsey sent Ms. Cobbs a text message that said "Peace and Quiet at my place...I'm just saying :)"  (See Exhibit 5).

54. On or about March 12, 2014, Mr. Dorsey sent Ms. Cobbs a text message that said "I'm at Stoney Badger on Old Forest Road, come eat some wings with me."  (See Exhibit 5).

55. Mr. Dorsey would also send text messages to Ms. Cobbs' daughter, Salay, asking her to deliver messages to Ms. Cobbs.

56. Ms. Cobbs informed Mr. Dorsey that she was really uncomfortable with his communications and that she needed to be assigned to work somewhere else.

57. After again letting Mr. Dorsey know that he was making her uncomfortable, he called her in his office and told her that he would now write her up a schedule on a weekly basis for her to sign off on.

58. Ms. Cobbs spoke with the Union steward, Chuck Hudson, ("Mr. Hudson") about the unwanted advances from Mr. Dorsey.

59. After speaking with Mr. Hudson about the unwanted attention from Mr. Dorsey, Ms. Cobbs reported the incidents to General Manager Karen Walton, and Gloria Berkley in Human Resources.

60. On or about May 2, 2014, Ms. Cobbs went in to speak with Ms. Walton about the unwanted advances from Mr. Dorsey, and showed her some of the text messages.

61. Ms. Walton indicated that she didn't think that text messages were "that bad" and that she would speak with Mr. Dorsey about the complaint, and speak with the supervisors about sending them to classes on inappropriate behavior.

62. Ms. Cobbs also reported that incidents to Mrs. Berkley, who stated that she had no control over who likes who, and asked how many times Ms. Cobbs told Mr. Dorsey no.

63. Later that day Ms. Cobbs submitted a written complaint about the incidents to Mrs. Berkley. (See Exhibit 6).

64. Mrs. Berkley later questioned Ms. Cobbs' other daughter, Nakita Rose, who also worked at GLTC, about Ms. Cobbs and Mr. Dorsey, asking whether she had ever seen them out together and whether Ms. Cobbs had ever invited Mr. Dorsey over to her home.

65. On or about May 5, 2014, Ms. Cobbs was informed by Mrs. Berkley that she would do and investigation and get back with her on the matter within thirty days.

66. After leaving Mrs. Berkley's office Ms. Cobbs went to her mailbox and had a letter indicating that she was being placed on furlough starting May 10, 2014.

67. After a week or two on furlough, Ms. Cobbs spoke with Thomas Coles, and was told that he also was on furlough but that Mrs. Berkley had called him back because a position had opened up, and that he declined.

68. According to company policy, Ms. Cobbs should have been the next person to be brought back after Mr. Coles, based on seniority.

69. Ms. Cobbs was eventually called back to work in early August and went back to work on or about August 8, 2014.

70. At orientation upon her return, Mr. Lacy was making statements such as "we are not going to tolerate some of the mess that people were saying before the furlough", that they "were not going to put up with unhappy people that are causing problems", and that the "company is moving forward and if you didn't like your job then there is the door and you can leave."

71. After being back for a few weeks Ms. Cobbs noticed that whenever she was on a route and had to communicate with another bus driver for a passenger, supervisor Dawn Droog would make a negative comment to her or give her a private discipline.

72. Locating another bus for a passenger was a part of Ms. Cobbs' job duties.

73. On one occasion when Ms. Cobbs was calling another driver about its location Ms. Droog commented that there was "too much talking" over the airway, but she would not make any comment when other drivers called to drivers for locations.

74. On or about August 29, 2014, Ms. Cobbs received a letter related to a report that on August 23, 2014, supervisor Droog attempted to contact her on the radio and received no response. The letter went into Ms. Cobbs' personnel file, but purported to be a "coaching opportunity" and not a disciplinary letter. (See Exhibit 7).

Page **9** of **18**

Case 6:16-cv-00015-NKM-RSB   Document 5   Filed 05/03/16   Page 9 of 18   Pageid#: 23

75. On or about September 26, 2014, Ms. Cobbs received a letter dated September 26, 2014, from Mr. Robey indicating that she was receiving Category 4 and 6 violations for incidents occurring on September 16 and 24 of 2014. (See Exhibit 8).

76. The September 24, 2014, "missout" alleged that Ms. Cobbs should have reported at 2:35 pm. (See Exhibit 9).

77. Ms. Cobbs had an appointment with Health Works, related to her work injury, on September 24, 2014, at 3:00 pm. (See Exhibit 10).

78. The September 26, 2014, letter stated that it documented over four offenses, and that a fourth Category 6 violation called for a discharge, but the offense was being reduced to a One Day Suspension. (See Exhibit 8).

79. On or about September 29, 2014, Union Steward Mr. Hudson requested a hearing in connection to the September 26, 2014, letter. (See Exhibit 11).

80. On or about September 30, 2014, supervisor B. Blankenship issued a Supervisor Report dated September 30, 2014, indicating that on September 23, 2014, Ms. Cobbs told her she had a Workmans Comp appointment with Gloria, and the next day, September 24, 2014, she told Blankenship that she still had the appointment. (See Exhibit 12).

81. On or about September 30, 2014, Ms. Cobbs filed a Grievance Form, requesting a hearing, related to the September 26, 2014, letter, and alleged that she was being targeted by Mr. Dorsey die to her sexual harassment complaints against him, and that Mrs. Berkley had questioned Ms. Cobbs' daughter, who is also an employee of the company, about the sexual harassment complaint. (See Exhibit 13).

82. In October of 2014 Ms. Cobbs began seeking treatment from Dr. George W. Luedke, who is a Psychiatrist, on referral from Dr. Matthew Tatom. (See Exhibit 25).

83. On or about October 9, 2014, Ms. Cobbs made an EEOC Discrimination charge against CVTMCI. (See Exhibit 20).

84. On or about October 10, 2014, the parties to the Grievance/Hearing procedure agreed to postpone the hearing due to Ms. Cobbs being held out of work by her treating physician, Dr. Luedke, until October 16, 2014. (See Exhibit 14).

85. On or about October 20, 2014, Dr. Tatom opined that Ms. Cobbs was not able to function as normal due to depression and anxiety attacks, and diagnosed her with PTSD, Anxiety, and Depression. Also, Dr. Luedke opined that Ms. Cobbs period of incapacity from work based on her injury would be from September 26, 2014, through April 1, 2015. (See Exhibit 22).

86. On or about October 23, 2014, Ms. Cobbs was notified that the sick leave she was currently under, and which began on October 1, 2014, qualified under the Family Medical Leave Act. (See Exhibit 15).

87. On or about November 18, 2014, Dr. Luedke diagnosed Ms. Cobbs with single incident major depression and opined that she could not return to work under the current supervision under any circumstances. (See Exhibit 16).

88. On or about November 20, 2015, Ms. Cobbs was issued a "missout" for allegedly reporting to a bus at 4:06pm, as opposed to 3:50/3:55, because she "refused to wait for a late bus in the cold outside". (See Exhibit 17).

89. On or about December 31, 2015, Ms. Cobbs was issued a Notice of Right to Sue by the U.S. Equal Employment Opportunity Commission. (See Exhibit 21).

90. On or about January 16, 2016, Ms. Cobbs was issued a "missout" for failing to give notice of her inability to drive 1 hour in advance, noting that she should have reported at 6:55am but called at 6:25am requesting light duty with a doctor's note. (See Exhibit 18).

91. On or about February 4, 2016, Ms. Cobbs was issued a "missout", indicating that she should have reported at 12:28pm but reported at 1:28pm. (See Exhibit 19).

92. On or about March 15, 2016, Dr. Luedke opined that Ms. Cobbs would be incapacitated related to her medical condition from February 15, 2016 through February 30, 2017. (See Exhibit 23).

93. On or about March 11, 2016, Ms. Cobbs was notified by letter that her sick leave which began on February 16, 2016, appeared to qualify under the Family and Medical Leave Act. (See Exhibit 24).

## V. CAUSES OF ACTION
### COUNT I:
### HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

94. Plaintiff re-alleges paragraphs 1-93 and incorporates them fully herein.

95. 42 U.S.C. §2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms. Condition, or privileges of employment, because of such individual's ... sex ...; or (2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex."

96. Ms. Cobbs is a member of a protected group, as she is a woman

97. The defendants, by and through their employees, managers and general managers, violated Ms. Cobbs's rights under Title VII (42 U.S.C. §2000e, et seq.), by engaging in actions and/or activities constituting hostile work environment, and sexual harassment.

98. These violations by defendants were based on Ms. Cobbs' sex, and affected the terms, conditions, and/or privileges of Ms. Cobbs' employment.

99. As a direct and proximate result of the unlawful conduct of the defendants, Ms. Cobbs has suffered, and will in the future suffer, great damages including front pay; back pay; medical expenses; loss of career opportunities, promotions and advancements; loss of retirement benefits; loss of fringe benefits; embarrassment; humiliation and inconvenience; severe mental anguish, stress; pain and suffering; loss of enjoyment of life and other non-pecuniary injuries in amounts to be determined at trial.

100. In addition, Ms. Cobb has incurred, and continues to accrue, attorney's fees and other costs related to the prosecution of this action.

## COUNT II:
## QUID PRO QUO DISCRIMINATION

101. Ms. Cobbs restates and re-alleges the allegations appearing elsewhere in the Complaint as though fully stated herein.

102. 42 U.S.C. §2000e-2(a) provides that it is an unlawful employment practice for an employer to "(1) discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or (2) to limit, segregate, or classify his employee ... in any way which would deprive to

Page **13** of **18**

Case 6:16-cv-00015-NKM-RSB   Document 5   Filed 05/03/16   Page 13 of 18   Pageid#: 27

tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex".

103. The defendants, by and through its employees and/or agents, violated Ms. Cobbs' rights under Title VII by engaging in actions and/or activities constituting quid pro quo sexual harassment.

104. Ms. Cobb has suffered tangible employment actions, resulting from her witnessing and rejecting the Assistant General Manager's sexual harassment. These tangible employment actions consisted of the conduct outlined above, including suffering a substantial loss of income.

105. These violations affected the terms, conditions, and/or privileges of Ms. Cobbs' employment, in violation of 42 U.S.C. §2000e, et seq.

106. As a direct and proximate result of the unlawful conduct of defendants, Ms. Cobbs has suffered, and will in the future suffer, great damages including front pay; back pay; medical expenses; loss of career opportunities, promotions and advancement; loss of retirement benefits; loss of fringe benefits; embarrassment, humiliation, and inconvenience; severe mental anguish, stress, and pain and suffering; loss of enjoyment of life and other non-pecuniary injury, in amounts to be determined at trial.

107. In addition, Ms. Cobbs has incurred, and continues to accrue, attorney's fees and other costs related to the prosecution of this action.

## COUNT III:
## RETALIATION

108. Ms. Cobbs restates and re-alleges the allegations appearing elsewhere in the Complaint as though fully stated herein.

109. 42 U.S.C. § 2000e-3 provides that it is an unlawful employment practice of an employer to "discriminate against any individual ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

110. Defendants, by and through its employees, agents and officers, including supervisory employees, intentionally, willfully, and wantonly retaliated against Ms. Cobb because of her complaints of the unlawful hostile work environment, sexual harassment, and/or quid pro quo discrimination, in that, after complaining of sexual harassment in violation of Title VII, Ms. Cobbs was subjected to unfair and arbitrary treatment, harassment, and interference with the terms, conditions and/or privileges of her employment, subsequent to Ms. Cobbs formally complaining of the discriminatory and unlawful treatment of her by defendant.

111. The actions and/or activities of defendant constitute retaliation for Ms. Cobbs' complaint of hostile work environment sexual harassment and/or quid pro quo discrimination, and are violations of Title VII of the 1964 Civil Rights Act.

112. As a direct and proximate result of the unlawful retaliation by defendants, Ms. Cobbs has suffered, and will in the future suffer great damages including front pay; back pay; medical expenses; loss of career opportunities, promotion and advancements; loss of retirement benefits; loss of benefits; embarrassment, humiliation and inconvenience; severe mental anguish, stress and suffering; loss of enjoyment of life and other non-pecuniary injury, in amounts to be determined at trial.

113. In addition, Ms. Cobbs has incurred and continues to accrue attorney's fees and other costs related to the prosecution of this action.

## COUNT IV:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114. Ms. Cobbs restates and re-alleges the allegations appearing elsewhere in the Complaint as though fully stated herein.

115. The Assistant Manager, Mr. Dorsey, by his conduct described herein, intended to cause Ms. Cobbs severe emotional distress.

116. The Assistant Manager, Mr. Dorsey intended his specific conduct and knew, or should have known that this conduct would likely result in severe emotional distress.

117. That Mr. Dorsey's conduct is outrageous and intolerable, in that it offends generally accepted standards of decency and morality.

118. As a direct and proximate result of Mr. Dorsey's conduct described herein, Ms. Cobbs has suffered and continues to suffer severe emotional distress, including but not limited to humiliation, embarrassment, anxiety, and indignity to her feelings, all in an amount to be determined at time of trial.

## COUNT V
## ASSAULT

119. Ms. Cobbs restates and re-alleges the allegations appearing elsewhere in the Complaint as though fully stated herein.

120. That Mr. Dorsey restrained Ms. Cobbs against her will and purposefully, knowingly, recklessly, and wrongfully touched and manhandled Ms. Cobbs by rubbing his body against hers, by caressing her knee, and by approaching her in a manner calculated to cause reasonable apprehension of bodily harm.

121. Ms. Cobbs did not want Mr. Dorsey to touch her, did not authorized Mr. Dorsey to touch her, and was offended by Mr. Dorsey touching her.

122. That Mr. Dorsey caused Ms. Cobbs to be touched against her will.

123. That Mr. Dorsey's acts were intended to restrain and harm Ms. Cobbs and such touching and threatening behavior was both harmful and offensive to Ms. Cobbs.

124. The conduct of Mr. Dorsey caused Ms. Cobbs to be in reasonable apprehension of offensive conduct and thereby constituted an assault.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, Helen L. Cobbs prays that this Court enter judgment in her favor and against the defendants on the above counts, and further prays for:

A.  An award of her actual damages as appropriate to the proof at trial, jointly and severally against all defendants;

B.   Punitive damages in the amount of three-hundred and fifty thousand ($350,000) against each defendant;

C.   Award on Counts One, Two and Three I, II, and III), judgment in favor of Ms. Cobb and against the defendants, for all relief available under Title VII of the Civil Rights Act of 1964, as amended, including but not limited to back pay, compensatory general damages, front pay in the amount of three-hundred thousand ($300,000), attorney fees and costs expended in this action, including any expert fees, pursuant to 42 U.S.C. §2000e-5(k), together with interest; jointly and severally against all defendants;

D.   On her common law Counts Four and Five (IV, V) for intentional infliction of emotional distress, and assault, Ms. Cobbs prays for an award of one hundred and fifty thousand ($150,000) plus interest; and

E.   Such relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED**

                                        Respectfully submitted,
                                        HELEN LAREEN COBBS


                                        By_____
                                                      Counsel for Plaintiff

Carlos A. Hutcherson, Esq.
Hutcherson Law, PLC
3610 Campbell Avenue
Lynchburg, Virginia  24501
Telephone:   (434) 455-8100
Facsimile:   (888) 351-0363
c.hutchersonesq@yahoo.com

Steven D. McFadgen Sr., Esq
McFadgen Law, PLC
3831 Old Forest Road, Suite 6
Lynchburg, Virginia  24505
Telephone:   (434) 385-4579
Facsimile:   (888) 873-1048

muchmorelaw@gmail.com